IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 12, 2006

## STATE OF TENNESSEE v. BRADLEY FERRELL

**Direct Appeal from the Circuit Court for Van Buren County**
**No. 1688-M     Larry B. Stanley, Jr., Judge**

---

**No. M2005-02552-CCA-R3-CD - Filed August 24, 2007**

---

The defendant, Bradley Ferrell, was convicted by a Van Buren County jury of escape, a Class A misdemeanor, and was sentenced by the trial court to eleven months, twenty-nine days, suspended after service of sixty days in the county jail. On appeal, he argues that the trial court erred in finding him competent to stand trial, in not permitting his expert witness to testify about his incapacity to form the requisite intent for the crime, in refusing his request for a special jury instruction on diminished capacity, and in overruling his motion for a new trial. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J., joined. D. KELLY THOMAS, JR., J., filed a dissenting opinion.

George A. Burke, Sr., Spencer, Tennessee (on appeal); and Steve Roller, McMinnville, Tennessee (at trial), for the appellant, Bradley Ferrell.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; Lisa Zavogiannis, District Attorney General; and Larry G. Bryant, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

On November 6, 2000, the Van Buren County Grand Jury returned an indictment charging the defendant with escape, a Class A misdemeanor, based on his September 2, 2000, unauthorized exit from the Van Buren County Jail. The defendant, who had a history of a brain injury, was subsequently found incompetent to stand trial and judicially committed to a mental institution. Further mental evaluations and judicially ordered commitments followed in the succeeding months

and years, both in connection with the instant case and with other charges pending against the defendant. On April 11, 2005, the defendant was discharged from the Middle Tennessee Mental Health Institute ("MTMHI") following a determination that he was competent to stand trial. On April 21, 2005, the trial court entered an order setting the case for a September 2, 2005, trial.

## Competency Hearing

The first witness at the defendant's competency hearing, held immediately prior to his trial, was Dr. Ronnie Stout, a clinical psychologist in the forensic services division of MTMHI. Dr. Stout testified that his records reflected that the defendant was admitted to the institute on February 1, 2000, for a month-long inpatient evaluation of his competency to stand trial, at the conclusion of which he was determined to be incompetent to stand trial and committable to a psychiatric institution for further treatment. The alleged incident at issue in the instant case occurred approximately seven months later, and on May 30, 2002, the defendant was readmitted to MTMHI for another month-long evaluation of his competency to stand trial. At the conclusion of that evaluation, the defendant was again determined to be incompetent to stand trial and committable to a psychiatric facility for further inpatient treatment. In May 2003, the defendant returned to the institute for an outpatient evaluation and was determined to be incompetent to stand trial but "not committable to the inpatient facility." In February 2004, the defendant was again admitted to MTMHI for a month-long inpatient evaluation and was determined to be incompetent to stand trial and committable for further treatment. The defendant was judicially committed to the institute for treatment in May 2004, and on April 11, 2005, was determined to be competent to stand trial and discharged from the facility.

Dr. Stout testified that the defendant's history indicated that he had suffered some type of permanent brain injury or damage in 1997 or 1998. The condition was static rather than progressive, which meant that the state of the defendant's brain tissue had neither worsened nor improved appreciably since the date of the injury. Although the defendant's brain injury was permanent, Dr. Stout and the institute's staff had, during the defendant's last period of hospitalization, improved the defendant's behavior through medication and rehabilitation. Consequently, the defendant had achieved better impulse control and "made progress on trial competence in terms of being able to communicate with an attorney, to give consideration to various options and to communicate his preferences to his attorney in that regard."

Dr. Stout acknowledged that the defendant had both short and long term memory deficits and likely would have difficulty recalling the events of September 2000, when his alleged jail escape occurred. He testified, however, that the defendant's "overt functioning" was "very different at different points in time." For example, the defendant had tested in the average range of overall intellectual functioning in 2000, but in the impaired range in 2002. Dr. Stout said that he attributed the difference in scores, in part, to the defendant's varying levels of cooperation with the testing process. He testified that if he split the differences between the two test scores, "what you see is a person whose overall intellectual functioning has certainly fallen off since his teen years but . . . may still remain slightly above the retarded range." Dr. Stout agreed that the defendant had a genuine problem and was not malingering.

-2-

On cross-examination, Dr. Stout testified that among the factors he considers when determining competency to stand trial is whether a person has "a basic knowledge and comprehension" of the possible outcomes of his case and is able to weigh, understand and express a coherent preference when presented with a choice on how to proceed in the case. When he discussed these concepts with the defendant, the defendant was able to understand the differences between pleading guilty or going to trial and between serving a sentence in jail or on probation. The defendant also understood that he had been appointed an attorney to represent him and that his original attorney had filed a motion to withdraw from his case. Dr. Stout stated that the defendant "might demonstrate some confusion as to whether the verdict is arrived at by the judge or the [j]ury," but understood "the dispositive nature of the trial." In his opinion, the defendant was competent to stand trial at the time he was discharged from the facility in April 2005. On redirect examination, Dr. Stout testified that the defendant's full scale IQ score in 2003 was 69.

Dr. Robert Zylstra testified that he was a licensed clinical social worker with a Masters of Social Work from the University of Michigan and a Doctorate of Educational Psychology from the University of Memphis. He said that he worked in "outpatient offices as part of the educational components with the Departments of Family Practice" and had met with the defendant on an outpatient basis on "a number of occasions" from August 1998 through August 29, 2005. When voir dired by the State, he acknowledged that he had never testified as to mental competency and that making such a diagnosis was not part of his normal duties at the University of Tennessee's Family Medical Clinic. Based on this testimony, the trial court overruled defense counsel's motion to have Dr. Zylstra qualified as an expert witness to state his opinion regarding the defendant's competency to stand trial. The court ruled, however, that defense counsel could question Dr. Zylstra about the defendant's overall level of functioning, including his ability to cooperate with counsel.

When direct examination continued, Dr. Zylstra testified that he began working with the defendant shortly after the defendant experienced his brain injury. He said the defendant had a great deal of difficulty comprehending and cooperating with his medical treatment plan and exhibited both short and long term memory deficits. He stated that when he met with him earlier that week, the defendant was unable to tell him the current day or month and had trouble recalling what he had done the previous week. Dr. Zylstra opined that the defendant would have a "very difficult time talking about what happened five years ago." He also said that the defendant appeared to be "very willing to say yes to be agreeable" and "to cooperate with other people just to gain approval." He did not believe that the defendant was malingering. On cross-examination, he testified that the defendant exhibited no signs of mental illness.

Dr. Stephen Adams, M.D., an assistant professor in the Department of Family Medicine at the University of Tennessee at Chattanooga, testified that he was the supervising physician in charge of the defendant's care following his December 28, 1997, admission to Erlanger Medical Center. The defendant was admitted in "status epileptic," experiencing seizures, and was placed on a

ventilator in the intensive care unit of the hospital, where he remained comatose for several days.[1] The defendant was discharged from the hospital on January 9, 1998, with "severe deficits in short-term and long-term memory." Dr. Adams testified that the defendant had continued to experience seizures and had made fifty-two visits to their office for follow-up treatment since his hospital discharge. During those outpatient office visits, the defendant was seen primarily by residents who worked under the supervision of Dr. Adams.

Dr. Adams testified that the defendant's brain damage was permanent. He said that the defendant's problem could be labeled as either organic brain syndrome or toxic encephalopathy, which were synonyms for the same condition. Although the defendant's behavior might vary from time to time, in Dr. Adams' opinion, his problem could not be treated with medication or therapy. As an example of the defendant's memory deficits, Dr. Adams related that the defendant had a severely swollen lip during a recent office visit but was unable to recall that he had been stung by a yellow jacket until prompted by his mother. He further testified that the information the defendant did provide was often unreliable:

> The other thing with him is he confabulates and that means make stuff up. That's something you see in people with dementia. That's something you see in people with brain injuries is they want to give the right answer but if they don't know what it is they'll add to what is in their head and say, yeah. What did you do yesterday? Well, he went and hung out with his brother. Did you have fun playing video games? Yeah. That sort of thing and that's a typical thing I've seen and that's a typical thing the other residents have seen, when he did elaborate on things, it's unreliable. His mother shakes her head. No that's not true and then has to straighten it out.

Dr. Adams testified that the defendant exhibited limited awareness of his surroundings and very limited judgment. He did not believe that the defendant would be able to remember the events of September 2000.

Upon questioning by the trial court, Dr. Adams testified that the only time he had dealt with the defendant on an inpatient basis was during his initial hospitalization. He said that most of the defendant's outpatient visits had been because of his "difficult-to-control seizure disorder." However, some of the visits had been "pleas for help from the family regarding angry outbursts, temper problems, . . . things that are typical for brain injured patients." Asked how many of those visits he had personally conducted with the defendant, Dr. Adams testified that he did not have a calender but "in terms of . . . sitting down with [the defendant] for an extended period of time," he had seen him at his hospital discharge and again on August 29, 2005.

---

[1] The record contains an affidavit from "Marcus W. Lee, M.D.," a resident physician at the Family Practice Center at the University of Tennessee at Chattanooga, which states that the defendant's brain injury was "a result of an episode of poisoning," during which the defendant "suffered severe seizures and was put on a ventilator." The poison was listed as "Jimson Weed."

On cross-examination, Dr. Adams testified that, in his opinion, the defendant was not competent to stand trial. He acknowledged that he based this opinion on the defendant's memory loss, which he believed rendered the defendant incapable of assisting his attorney with his defense. He stated that he had not performed any formal psychological testing on the defendant. Asked if he had utilized any of the specific procedures to determine competency to stand trial, Dr. Adams replied: "We talked on the 29th. He had no understanding of what was occurring and the conversation went no where [sic]."

## Trial

The State's proof at trial established that on September 2, 2000, James McCormick, one of the defendant's cell mates at the Van Buren County Jail, complained to Jailer Juanita Brymer that a third cell mate's O-2 machine was not functioning properly. As Brymer was checking the machine, the defendant kept walking out of the cell into the hallway but returned to the cell each time she ordered him to get back inside. However, when she returned with some O-2 tubes for the machine, both McCormick and the defendant stepped out of the cell. McCormick placed his hand on Brymer's side and said, "Don't give us any problems[.]" She replied that she would not give them any trouble, and McCormick walked out of the jail followed by the defendant. Later that night, the defendant and McCormick were apprehended at McCormick's sister's house. On cross-examination, Brymer testified that it appeared to her that McCormick was the one who developed the escape plan and that the defendant had just followed McCormick out of the jail.

Jerry Hodges testified that he was part-time reserve officer for the Van Buren County Sheriff's Department and had participated in the capture of the defendant and McCormick following their escape from the county jail. On cross-examination, he acknowledged that he had told defense counsel that "anyone could lead [the defendant] anywhere."

McCormick testified that he developed the plan for the escape and that the defendant simply followed him when he walked out of the jail. He said that the defendant "was on medication and stuff," and he did not know if the defendant "really kn[ew] what he was doing." On cross-examination, he acknowledged that he had discussed the escape plan with some of his fellow inmates before leaving the jail. He further acknowledged that, after leaving the jail, the defendant took him to the defendant's house and got one of his relatives to drive them to McCormick's truck.

## ANALYSIS

### I. Competency to Stand Trial

The defendant first contends that the evidence preponderates against the trial court's finding that he was competent to stand trial. He argues that the trial court erred by applying too much weight to Dr. Stout's testimony, by finding that he tested in the average range of intellectual functioning, and by failing to consider whether his memory deficits prevented him from receiving a fair trial. He further argues that the burden of persuasion at the September 2, 2005, hearing should have been

placed on the State "in overturning what had already been decided in previous competency hearings." The State argues that it was the defendant's burden to establish incompetency by a preponderance of the evidence and that the trial court appropriately gave greater deference to the testimony of Dr. Stout as the only professional with recent, extensive inpatient experience with the defendant. We agree with the State.

Both the Fourteenth Amendment of the United States Constitution and Article I, Section 8 of the Tennessee Constitution prohibit the trial of a mentally incompetent person. State v. Blackstock, 19 S.W.3d 200, 205 (Tenn. 2000) (citing Pate v. Robinson, 383 U.S. 375, 86 S. Ct. 836 (1966); Berndt v. State, 733 S.W.2d 119 (Tenn. Crim. App. 1987)).

> The standard for determining competency to stand trial is whether the accused has "the capacity to understand the nature and object of the proceedings against him, to consult with counsel and to assist in preparing his defense." State v. Black, 815 S.W.2d 166, 174 (Tenn. 1991) (quoting Mackey v. State, 537 S.W.2d 704, 707 (Tenn. Crim. App. 1975)); see also Dusky v. United States, 362 U.S. 402, 402, 80 S. Ct. 788, 789, 4 L. Ed. 2d 824 (1960) (ability to consult with lawyer and a "rational as well as factual understanding of the proceedings").

Id. The defendant is required to show incompetence by a preponderance of the evidence, and the trial court's findings are conclusive on appeal unless the evidence preponderates against them. State v. Reid, 164 S.W.3d 286, 306-08 (Tenn. 2005) ("We have reviewed the approaches taken in other jurisdictions, and in our view the better reasoned choice is the standard that requires defendants to establish their incompetency by a preponderance of the evidence."); see also State v. Leming, 3 S.W.3d 7, 13-14 (Tenn. Crim. App. 1998); State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991).

In arguing that the State should have been required to carry the burden of persuasion to prove his competence, the defendant asserts that the September 2, 2005, competency hearing was a continuation of a previous competency hearing, at which he had "scaled the wall of persuasion and met the burden of proof establishing his incompetency." The defendant is mistaken. In support of this claim, he cites a February 23, 2004, "Certificate of Need for Involuntary Commitment," which states, among other things, that he was admitted to MTMHI for inpatient forensic evaluation and was "found to be not competent to stand trial." However, the defendant ignores the fact that he was discharged from that same facility a little over a year later following a determination that he was competent to stand trial. Thus, it was the defendant's burden to prove his incompetency by a preponderance of the evidence at the September 2, 2005, hearing.

In determining that the defendant had failed to meet that burden, the trial court acknowledged the educational backgrounds of Dr. Adams and Dr. Zylstra, as well as their respective experience and expertise, but found that the testimony of Dr. Stout carried more weight. The court fully explained its reasoning:

The court gives great deference to Dr. Stout, the clinical psychologist with a Ph.D. from the University of Alabama. One of the main reasons, let me start with this, he has seen this gentleman on an inpatient basis for quite a long time. He made the statement they did not see full capability from this defendant on a day-to-day basis. The other two people that testified saw this gentleman on an outpatient basis. When you take a doctor with the experience in determining whether someone is qualified to go to trial, to stand trial, whether they are competent, the things he looked at seemed to be somewhat more appropriate or vital in making that determination than the other two individuals who testified. He was functioning, they actually did the testing of the functioning and it came out to an average, that this gentleman was in an average range.

. . . .

I have thought about this a great deal. I also considered that the defendant was on an average based on the testing done by Dr. Stout, averaged above the retarded range and he was able to weigh - - and I do take issue with the fact that you said Dr. Stout did not give him open-ended questions but always asked yes or no. That was not the impression I got. He was able to weigh different outcomes and understood the difference between probation and going to jail and what would happen. He also said his cooperativeness varied which led me to believe that on a day-to-day basis it's less easy to come in and be uncooperative and try to make yourself appear that you are less competent than you are and this doctor had the ability to . . . evaluate that over a long period of time, whereas the other doctors or psychologists were only able to do that on a one-day-at-a-time basis, on an outpatient basis. I think he has a basic grasp of the legal system according to Dr. Stout and as I said, I give great deference to his testimony. They worked to help him become competent and he was able to do that.

. . . .

It is my opinion and the opinion of the court that this gentleman is competent to stand trial to face this charge. It is not a serious offense in as far as it is a felony or in that it is a complicated concept, the concept of escape. It's just not something that would require an over abundance of intelligence or competence to be able to assist and I think he is able to do that.

The record supports the trial court's findings. As the trial court noted in its ruling, Dr. Stout was the only one of the witnesses who had regular, long-term encounters with the defendant on a recent inpatient basis. More importantly, he was also the only one of the witnesses who had experience in determining competency to stand trial. Thus, although Dr. Adams may have had the most recent visit with the defendant, we cannot conclude that the trial court erred by giving greater deference to the testimony of Dr. Stout.

We also disagree with the defendant's contention that the trial court misunderstood Dr. Stout's testimony with respect to his current overall level of intellectual functioning. Dr. Stout testified that the defendant tested in the average range of overall intellectual functioning in 2000 but in the impaired range in 2002. By averaging the scores, he concluded that the defendant's intellectual functioning had fallen off since his teen years but that he "may still remain slightly above the retarded range," a fact which the trial court noted in its ruling. Dr. Stout acknowledged the defendant's brain damage, low IQ, and memory deficits but said that memory was only one of several factors he considered when determining his competency to stand trial. He stated that the defendant demonstrated in his conversations with him that he knew he had an attorney to represent him, understood the difference between pleading guilty and going to trial, and was capable of expressing a coherent choice when faced with different options on how to proceed in the case.

The defendant cites State v. Leming, 3 S.W.3d 7 (Tenn. Crim. App. 1998), to argue that the trial court also erred by failing to consider whether his memory deficits prevented him from receiving a fair trial. In Leming, this court concluded that due process requires that a trial court determine not only whether an amnesiac defendant is able to consult with his attorney and understand the proceedings against him, but also whether he is able to receive a fair trial in spite of his inability to recall the alleged crime:

> An analysis of relevant cases leads us to the conclusion that in order to ensure that an amnesiac defendant receives the guarantees of due process, two inquiries must be made. First, there must be an analysis under Dusky [v. United States, 362 U.S. 402, 80 S. Ct. 788 (1960),] as to whether the defendant has sufficient ability to consult with her attorney with a reasonable degree of rational understanding and whether the defendant understands the proceedings against her. Second, there must be an analysis of whether the defendant can receive a fair trial despite the amnesia, considering such factors as whether the crime and the defendant's whereabouts can be reconstructed without the defendant's testimony and whether access to government files would assist the defendant in preparing a defense.

3 S.W.3d at 16 (citations omitted).

We disagree with the defendant's contention that the trial court failed to consider whether his memory deficits prevented him from receiving a fair trial. In its findings, the trial court specifically noted that there was "no question [the defendant] would have memory deficits from 2000 or 1999 or 1997." The court also noted, however, that the charge was relatively minor and did not involve any complicated concepts. The court also appropriately observed that a memory deficit, alone, does not render a defendant incompetent to stand trial. Based on the evidence presented at the competency hearing, we cannot conclude that the trial court erred in finding the defendant competent to stand trial.

## II. Opinion Testimony

The defendant next contends that the trial court erred by not allowing Dr. Adams to testify as an expert psychiatric witness about various matters, including the defendant's alleged incapacity to form the *mens rea* for the crime of escape. As we will explain, the trial court concluded that Dr. Adams could testify as an expert medical witness but could not provide opinion testimony as to psychiatric matters. The State responds that the court ruled correctly in this regard.

In our review, we first will summarize Dr. Adams' testimony as to his background and experience and then the psychiatric opinions which the defendant sought from him.

In a jury-out proffer, Dr. Adams testified that he supervised "residents in training in family medicine both in an inpatient and outpatient situation." He estimated that approximately thirty percent of his patients had "some mental or psychiatric issue as part of their presenting complaint" and testified that he arrived at that "general figure" based on the results of a study performed at the University of Tennessee at Memphis, which had examined a program similar to the one in which he worked in Chattanooga.

Dr. Adams testified that the defendant's brain injury had left him with fixed deficits in his cognition, short- and long-term memory, and awareness of his surroundings. He said that several EEGs were performed on the defendant, both in the hospital and after his discharge. The one performed in the hospital was "severely abnormal," and the ones performed after his discharge showed "mild global slowing which is not a way to diagnose or determine competency but does indicate that there is an underlying brain disorder." In addition, the defendant had a CT scan in September 2003 which showed mild changes consistent with atrophy, or shrinking of his brain. In sum, Dr. Adams testified that he did not believe the defendant "was competent to intentionally commit a crime that requires planning ahead of time simply because he has deficits in memory."

On cross-examination, Dr. Adams acknowledged that he had no specialization in the field of psychology and had never been called upon to give a psychiatric opinion in court. He said, however, that he did not believe the defendant had a psychiatric condition. Instead, the defendant had a brain injury, which "would be classified on a different axis." He agreed that the defendant probably would be aware of where he was if he were incarcerated in the county jail. He also acknowledged that the defendant would know when he was walking out the door of the jail.

During the hearing, when defense counsel asked Dr. Adams if he was "familiar with the word intent," he responded that he was. This question came after Dr. Adams had testified at length, without objection from the State, as to the defendant's brain injuries and their effects upon him. The State then objected, saying that Dr. Adams was being asked to give a psychiatric opinion, for which he was not qualified, rather than a medical opinion, for which the State acknowledged he was competent and to which he already had testified in detail and without objection.

At the conclusion of the hearing, the trial court found that Dr. Adams could testify as an expert medical witness as to his diagnosis of the physical causes for the defendant's mental condition but not as a psychiatric expert:

> THE COURT: I will deem him as an admissible expert in the area of medicine and diagnosing the particular brain disorder that the defendant has but yes, so I will grant that to some extent but the other part dealing with the – what were you just saying?
>
> [THE STATE]: The psychiatric. According to [State v.] Hall, [958 S.W.2d 679 (Tenn. 1997)], you have to introduce psychiatric testimony. If you were going to do it in a specific intent crime it would still have to be –
>
> THE COURT: I agree. He was not admitted as a psychiatric expert.

On appeal, the defendant argues that testimony regarding his mental state was relevant to his defense and Dr. Adams was qualified to provide expert psychiatric testimony explaining it. The State responds that the trial court properly excluded the testimony on the basis that Dr. Adams was not an expert in the field of psychiatry or psychology and had only limited personal experience with the defendant.

In analyzing this issue, we first will review applicable authorities and, then, explain why we do not believe that the record supports the defendant's view of the substance and relevance of Dr. Adams' testimony.

The trial court is given broad discretion in resolving questions concerning the admissibility of expert testimony, and we will not overturn its ruling absent a finding that it abused its discretion. See State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002); State v. Coley, 32 S.W.3d 831, 833 (Tenn. 2000); State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993). "The abuse of discretion standard contemplates that before reversal the record must show that a judge 'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" Coley, 32 S.W.3d at 833 (quoting State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999)).

In State v. Hall, 958 S.W.2d 679, 689 (Tenn. 1997), cited by the defendant, our supreme court concluded that as long as the general standards for relevancy and expert testimony are met, "psychiatric evidence that the defendant lacks the capacity, because of mental disease or defect, to form the requisite culpable mental state to commit the offense charged is admissible under Tennessee law." Tennessee Rules of Evidence 702 and 703 govern the admissibility of expert testimony. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness

qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Evidence is "'scientific, technical, or other specialized knowledge' if it concerns a matter that 'the average juror would not know, as a matter of course.'" State v. Murphy, 953 S.W.2d 200, 203 (Tenn. 1997) (quoting State v. Bolin, 922 S.W.2d 870, 874 (Tenn. 1996)). Tennessee Rule of Evidence 703, "Bases of Opinion Testimony by Experts," provides that "[t]he court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness."

As we have set out, the trial court found Dr. Adams to be an expert medical witness but not an expert psychiatric witness. We note that, after the court had made this determination, the defendant did not seek an explanation from the court as to exactly what testimony would be allowed from Dr. Adams as a medical, rather than a psychiatric, expert and did not call Dr. Adams to testify at the trial. Thus, we must speculate as to how far he would have been allowed to go in his testimony as a medical expert witness. We cannot, for example, assume, as does the defendant, that Dr. Adams could not offer testimony as to the defendant's "deteriorated mental state," including his diagnosis of the defendant's brain damage and its effect on his long- and short-term memory and his awareness of his surroundings. In fact, without drawing an objection, he had testified in detail regarding each of these areas, the State apparently concluding that such testimony involved a medical, rather than a psychological, opinion.

In his reply brief, the defendant argues that his problem "was not an emotional or behavioral problem to be treated and diagnosed by a psychologist or a mental illness to be diagnosed and treated by a psychiatrist, it was a medical problem to be diagnosed and treated by a medical doctor and that doctor was Dr. Steve Adams, the one who both diagnosed and treated the defendant for 8 years." This argument is based upon the defendant's belief that Dr. Adams could not have testified as to the defendant's mental deficits and their causes. In our view, there is no basis for such an assumption.

As we have set out, the State did not object at the hearing when Dr. Adams explained his diagnosis of the defendant's mental condition:

[The defendant] suffered a brain injury that leaves him with deficits in cognition, deficits in short-term memory, deficits in long-term memory, deficits in awareness of his surroundings. Those deficits are fixed. They do not change with time, in my opinion, and they remain the same now as what I saw when I discharged him from the hospital January of 1998.

Likewise, without drawing an objection, Dr. Adams explained the effects of this injury to the defendant's long- and short-term memory and his inability to understand his surroundings: "Short-term memory meaning things today or in the last few days. Long-term memory meaning things further away than that and I think just a general lack of understanding of his surroundings."

-11-

Additionally, Dr. Adams said that the defendant suffered from "[o]rganic brain syndrome." It was only when Dr. Adams was asked if he was "familiar with the word intent" that the State objected that he could not respond to this question because he was not a psychiatric expert witness.

Thus, we disagree with the defendant's claim that the trial court ruled that Dr. Adams could not testify as to the reasons for the defendant's mental deficits and their effects upon him. In fact, the court was not asked and, therefore, did not explain how far, as a medical but not a psychiatric expert, Dr. Adams could go in explaining the causes and effects of the defendant's mental problems. Further, we disagree with the defendant's assertions as to what Dr. Adams' testimony would have been if he had been allowed to testify as a psychiatric expert. The defendant contends that Dr. Adams would have said that the defendant could not form the intent required to commit escape. However, the record does not support this contention. When Dr. Adams was asked at the hearing if he believed that the defendant was "capable of planning out intent, intentionally, knowingly planning out a crime, the elements of this, or recklessly," he responded that, in his opinion, the defendant was not "competent to intentionally commit a crime that requires planning ahead of time simply because he has deficits in memory." However, pre-planning is not an element of escape. Additionally, when asked during cross-examination "[i]f [the defendant] was incarcerated in the county jail with a steel door locked, do you think he would know where he was?" Dr. Adams responded, "Probably." Likewise, when asked "if [the defendant] leaves that facility on his own he would do that knowingly, correct? I mean he would know that he's leaving is what I'm getting at," Dr. Adams responded, "He would know he's going out the door." When asked "if the door were opened and somebody walked out, could he follow them and not realize that he's intentionally or knowingly breaking out of jail?" Dr. Adams responded, "I would not think he would know the full consequences of that action. I don't think there is any way he could."

On appeal, the defendant argues that "[t]he theory propounded by the Defendant in the case at hand was that Defendant Bradley Ferrell, in his deteriorated mental state, was led to leave the Van Buren County Jail by the inducement of Co-Defendant McCormick not realizing the consequences of what he was doing and without forming any general intent to escape or even understanding what he was doing." However, as we understand Dr. Adams' testimony in this regard, it was that the defendant was not capable of forming the intent to commit a crime that required planning but that he would know that he was in jail and that he was walking out of it. Dr. Adams did not explain his answer that the defendant would not know the full consequences of his leaving the jail. For instance, he was not asked whether the defendant would know that walking out of the jail was a crime.

"Escape" is defined, in pertinent part, as the "unauthorized departure from custody." Tenn. Code Ann. § 39-11-602(3). The required mental states are that it be done intentionally, knowingly or recklessly. See Tenn. Code Ann. § 39-11-301(a)(2)(c). Because advance planning is not an element of escape, Dr. Adams' opinion that the defendant was unable to pre-plan an escape was irrelevant and might have confused the jury.

Accordingly, we conclude the record reveals that the trial court did not abuse its discretion in determining that Dr. Adams was not qualified to testify as a psychiatric expert. We further

conclude that, even if the ruling were in error, it was harmless because Dr. Adams would not have testified that the defendant lacked the capacity to form the intent required for the crime of escape, nor would he have said that the defendant did not know that he was in jail or that leaving jail was a crime. In sum, the proffered testimony of Dr. Adams regarding "intent" was not relevant to the crime with which the defendant was charged and would not have benefitted him.

### III. Special Jury Instruction

The defendant next contends that the trial court committed reversible error by its refusal to issue his requested special jury instruction on diminished capacity. The State argues that because no evidence of diminished capacity was introduced at trial, the trial court properly denied the request.

Defendants have a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). As long as the instructions given are correct statements of the law and "fully and fairly set forth the applicable law," the trial court does not commit error in "refus[ing] to give a special instruction requested by a party." State v. Bohanan, 745 S.W.2d 892, 897 (Tenn. Crim. App. 1987).

The record reflects that the trial court properly instructed the jury on the State's burden of proof and the elements required to prove the offense. The seven paragraphs in the special jury instruction proposed by the defendant consist primarily of statements, taken from Hall, 958 S.W.2d at 689-91, on the role of expert, psychiatric testimony in a case in which evidence is presented that a defendant was unable to form the requisite culpable mental state as a result of mental disease or defect. Since no expert psychiatric testimony was presented at the defendant's trial, these statements were not relevant to the case. We, therefore, agree with the State that the trial court did not err in refusing to give the special instruction requested by the defendant.

### IV. Denial of Motion for New Trial

As his final issue, the defendant contends that the trial court erred by denying his motion for a new trial. Specifically, he argues that the trial court should have granted a new trial based on the fact that one of the jurors expressed difficulty hearing portions of the trial testimony. The State argues that the defendant has waived the issue on appeal by failing to make a timely objection at trial or include the transcript of the motion for new trial in the record on appeal. The State further argues that even if not waived, the defendant is not entitled to relief on the basis of this issue because he has not shown any prejudice to his case. We review this issue under an abuse of discretion standard. See State v. Meade, 942 S.W.2d 561, 565 (Tenn. Crim. App. 1996).

Following McCormick's testimony, a break occurred in the case while defense counsel spoke with the defendant about his desire to testify. As that was occurring, Juror Number 12 informed the court that she had been having difficulty hearing the testimony:

-13-

JUROR NUMBER 12: I have a hearing problem and I'm not able to hear everything they're saying.

THE COURT: If there is any time there is something you cannot hear, please raise your hand and let us know and I'll make sure that the - -

JUROR NUMBER 12: I've not been able to hear what all the witness said.

THE COURT: If there is something in particular that you're having trouble, raise your hand.

JUROR NUMBER 12: I haven't been able to hear.

THE COURT: Just let me know.

Immediately following the jury's announcement of its verdict, the following transpired:

[DEFENSE COUNSEL]: One question, Your Honor. Would you ask [Juror Number 12] if she was able to hear the testimony today because there was -- I'll just say [appellate counsel] believes he heard her say she could not hear the testimony today.

THE COURT: I don't think that's appropriate. I asked her to raise her hand if there was any particular thing she could not hear. So I don't think that's appropriate at this time. I'll note your objection.

In his reply brief, appellate counsel asserts that he overheard Juror Number 12's remarks as a spectator in the courtroom and that his first opportunity to inform trial counsel did not occur until the jury retired to deliberate its verdict. Even so, trial counsel could have raised his objection at that point in the proceedings, as the jury was beginning its deliberations, rather than waiting until the jury had already reached its verdict. Moreover, it was the defendant's duty to prepare a complete and accurate record on appeal to ensure meaningful appellate review. Without the transcript of the motion for new trial, we cannot know if or how the trial court addressed this issue. Thus, we agree with the State that the defendant has waived the issue for his failure to raise a timely objection at trial and for his failure to include the transcript of the motion for new trial in the appellate record. See Tenn. R. App. P. 36(a); Tenn. R. App. P. 24(b).

We further agree with the State that, even if not waived, the defendant is not entitled to relief on the basis of this issue because there is no evidence that he was prejudiced as a result of the juror's difficulty hearing portions of the testimony. In State v. Chestnut, 643 S.W.2d 343, 346 (Tenn. Crim. App. 1982), this court concluded that a juror's having slept during approximately five minutes of the trial testimony was not grounds for a new trial when there was no proof that the defendant was prejudiced as a result of the missed testimony. At the point at which Juror Number 12 complained

-14-

about not having heard everything that the witnesses said, only one defense witness, James McCormick had testified. As the State points out, much of his testimony was not beneficial to the defendant, as he related how he and his fellow inmates had discussed the escape plan beforehand and that the defendant had led him to his home after the escape. Thus, we conclude that the trial court did not err in denying the defendant's motion for a new trial.

## **CONCLUSION**

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE